# United States Court of Federal Claims

No. 14-427 C
March 4, 2019

_____

**JAMES TALCOTT CONSTRUCTION INC.,**

      *Plaintiff*,

v.

**UNITED STATES OF AMERICA,**

      *Defendant*.

_____

*Steven D. Meachem, Esquire*, Peel Brimley LLP, Seattle, WA, for plaintiff.

*Mariana Terea Acevedo*, *Esquire*, United States Department of Justice, Civil Division, Washington, DC; *Michael Duane Austin*, *Esquire*, United States Department of Justice, Civil Division, Washington, DC; and *Ryan Michael Majerus*, *Esquire*, United States Department of Justice, Civil Division, Washington, DC, for defendant.

## POST-TRIAL ORDER AND OPINION

**Hodges**, *Senior Judge*.

This case arises from a dispute between James Talcott Construction, Inc., and the United States through the Department of Defense, Department of the Army, and the United States Army Corps of Engineers.

The contract called for the construction of military family housing at Malmstrom Air Force Base in Great Falls, Montana. Talcott alleges that it suffered damages because the Government supplied an incomplete contract and a defective design, which led to the performance of additional work.

We conducted a nine-day trial in Seattle, Washington, and made the following relevant conclusions: (1) the contract contained performance specifications, not design specifications; (2) Talcott knew, or should have known, that site conditions favored mold growth; (3) the Government did not direct Talcott to perform work outside the contract terms; and (4) Talcott is not entitled to costs associated with scheduling delays.

# BACKGROUND

### Talcott Begins Construction

The Government sought to replace deteriorating housing for military families at the Malmstrom Air Force Base in Great Falls, Montana. The Government awarded the "Phase 7E" contract to Talcott in May 2010 and issued a "Notice to Proceed" effective June 2010.

Phase 7E involved the construction of thirteen buildings, each with seventy units constructed with pile and grade beam foundation systems, wood framed and shingled roofs, one-car garages, fenced back yards, and concrete patios.[1] The Government expected completion of the project by March 3, 2012.

Talcott began construction by pouring concrete foundations. After the concrete set, Talcott installed wooden floor joists and subfloor decking within the foundation area. The design made it clear that these materials would be enclosed in a crawl space. A crawl space is enclosed when sheathing is installed on the first floor. Sheathing is a board of material, usually wood, used to construct floors, roofs, and walls. Talcott elected to use untreated "Exposure 1" Opposed Strand Board for the first-floor sheathing and Opposed Strand Board joists for crawl spaces framing; Exposure 1 requires the moisture content level to be maintained below nineteen percent.

A building's crawl space is typically ventilated by exterior vents and the air circulation regulates temperature and humidity. An enclosed crawl space depends on a mechanical system to maintain its temperature and humidity. It blows cool, dry air in the enclosed area to prevent moisture buildup and frozen pipes.

The Government's design also incorporated sloped grading surfaces to drain water into sump basins and trench drains to divert water away from the foundation. To prevent groundwater vapor from entering the crawl space, a twenty-milliliter thick plastic polyethylene sheet covers the soil below the sheathing.

In this case, the concrete, wood, and soil remained exposed to snow and rain before Talcott enclosed the subfloor with sheathing. Talcott did not install temporary ground vapor barriers despite the presence of moisture on site.

### Talcott Refuses Inspections of Building 620

An Air Force project manager visited the site for an inspection in November 2010. The project was always subject to reasonable inspections to certify the quality of

---

[1] Buildings 620-626, 628, 630-633, 635, and 637.

construction. FAR 52.246-12 (Inspection of Construction). He discovered that anchor bolts, which secure the finished structure to its foundation, installed out of alignment, misplaced, or missing entirely in buildings 620, 621, and 622. Concerned about the poor workmanship at such an early stage of the project, he called for an immediate inspection by the lead project engineer at the base.

The lead project engineer and the project manager returned two weeks to evaluate its quality. Their inspection confirmed that building 621 and building 622 did not comply with the contract. An assessment of building 620 did not occur because sheathing covered the subfloor structure. Talcott refused to cut access holes in the first-floor sheathing to allow for an examination of the anchor bolts on November 15, December 1, and December 29, 2010.

### Talcott Discovers Mold

On January 5, 2011, workers discovered vast amounts of mold growth in building 620 after they cut access holes to install pipes in the crawl space. Talcott initiated preliminary mold clean up procedures, resealed the crawl space, and formally notified the Corps about the mold on January 6, 2011. The humidity measured more than eighty percent. JX 100-4912, 4922; Tr. 825:3-12 (Albrecht).

The contract's "Safety and Occupational Health" clause demands that mold abatement be "overseen by a person experienced in mold behaviors and building design and construction, such as an industrial hygienist" and that "post-remediation air sampling shall be done in the immediate area and in any areas in the mold-spore or vegetative air-pathway, to verify that the remediation has been done properly and to ensure that there is no remaining hazard." JX601-11594; Tr. 1157:17-25 (Henson). On January 26, 2011, the Corps advised Talcott that a remediation plan must "include any applicable testing required, that includes immediate measures to stop existing and future mold growth within 7 days" of the letter's receipt. DX 18.

Talcott hired CTA Construction and Environmental, LLC, to develop a mold remediation plan. On February 10, 2011, CTA's certified industrial hygienist presented Talcott with a mold remediation plan after evaluating the crawl space in January and in February. The plan included three recommendations that varied in price. For reasons unknown, Talcott did not deliver CTA's recommendations with the Corps until March 1, 2011.

### Talcott Alleges Damages

Talcott completed the project on July 25, 2012, a total of 145 days after the deadline. In October 2012, Talcott filed a Request for Equitable Adjustment claiming that it incurred additional costs under the "changes clause" of the contract because: "(1) the

contract disc provided by [the Government] to Talcott lacked Amendment 6; (2) design flaws resulted in foundation mold problems; (3) a change in established inspection standards; (4) civil and structural design ambiguity; [and] (5) performance of out-of-scope work."[2] Talcott subsequently petitioned for a final decision from a Government contracting officer in June 2013. The contracting officer denied the claim and determined that it lacked merit.

Talcott filed a complaint against the Government in May 2014, which included claims for breach of contract, breach of implied warranties, and breach of good faith and fair dealing, and sought the following relief: (1) a court order entering judgment against the Government for breach of contract and breach of implied warranties; (2) a court order awarding Talcott damages in the amount proven at trial; (3) a court order directing the Government to change Talcott's performance evaluation from "unsatisfactory" to "above average"; (4) attorneys' fees and costs pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 (2006); and (5) such other and further relief the court deems just and equitable.

At trial, Talcott sought relief amounting to $975,156 in total damages, including: (1) $330,285 for a 197-calendar day delay attributed to mold remediation and other scheduling changes; (2) $295,176 in direct damages for mold remediation and prevention;[3] (3) $175,199 in labor costs to hire subcontractors to complete the project; and (4) $174,455 in liquidated damages.

## SUBJECT MATTER JURISDICTION

Pursuant to the Tucker Act, the United States Court of Federal Claims may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a) (2012).

The United States Court of Federal Claims has jurisdiction, under the Tucker Act, to adjudicate any claim arising under the Contract Disputes Act, 41 U.S.C. §§ 7101–7109. The Contract Disputes Act governs any claims based upon "any express or implied contract . . . made by an executive agency for (1) the procurement of property, other than real property in being; (2) the procurement of services; (3) the procurement of

---

[2] Amendment 6 contained adjustments to the building foundation coordinates and changed grading measurements in conformance with the new locations.

[3] At trial, plaintiff's counsel informed the court that $32,176 representing increased quality control inspections was erroneously included in the direct damages claim of $327,393. The amount above reflects the corrected claim.

construction, alteration, repair, or maintenance of real property; or (4) the disposal of personal property." 41 U.S.C. § 7102(a).

The term "claim" is defined "as a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to this contract." 48 C.F.R. § 52.233–1. A claim need not be in any particular form or use any particular wording, but it must contain "a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning Maint., Inc. v. United States*, 811 F.2d 586, 592 (Fed. Cir. 1987). The claim must communicate to the contracting officer that the contractor is requesting a final decision. *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1543 (Fed. Cir. 1996).

A contractor may bring an action *de novo* in federal court "within 12 months from the date of receipt of a contracting officer's decision." 41 U.S.C. § 7104(b), but the contractor must have first submitted a valid claim to its contracting officer and received the contracting officer's final decision on that claim. *M. Maropakis Carpentry, Inc. v. United States,* 609 F.3d 1323, 1327 (Fed. Cir. 2010).

## PLAINTIFF'S CASE

Talcott raised the following issues in its post-trial brief:

1. Whether the Government breached the warranty of plans and specifications, as well as whether the construction of the crawl spaces was a design specification or a performance specification.

2. Whether the Government breached the contract by providing a deficient set of plans and specifications, which led to the development of mold in the crawl spaces;

3. Whether the Government breached the contract by failing to disclose its superior knowledge relating to mold growth in the crawl spaces;

4. Whether Talcott was required to perform additional or changed work, entitling Talcott to additional compensation and/or damages;

5. Whether Talcott is entitled to an adjustment to the contract and/or damages for delays and costs associated with mold remediation.

The court addresses these matters below.

I.  **Breach of the Warranty of Plans and Specifications**

Plaintiff contends that the Government issued defective, conflicting, and ambiguous design documents that did not represent the project accurately. Further, they claim that the contract did not contain plan or procedure to prevent mold growth and that the design failed to ventilate the crawl spaces adequately. Defendant claims that Talcott's poor construction methods caused mold to grow in the crawlspaces.

When the government includes detailed specifications in a contract, it impliedly warrants that: (1) if the contractor follows those specifications, the resultant product will not be defective or unsafe, and (2) if the resultant product proves defective or unsafe, the contractor will not be liable for the consequences. *United States v. Spearin,* 248 U.S.132, 136–37 (1918). While there are two types of specifications, design and performance, only a design specification creates an implied warranty.

Performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving [it]." *Blake Constr., Co. v. United States,* 987 F.2d 743, 745 (Fed. Cir.), *cert. denied,* 510 U.S. 963 (1993) (quoting *J.L. Simmons Co. v. United States,* 188 Ct. Cl. 684 (1969)). A design specification "describe[s] in precise detail the materials to be employed and the manner in which the work is to be performed" and there is "no discretion to deviate from the specifications but is required to follow them as a road map." *Id.* However, a contract can provide some details and directions concerning the performance of work without necessarily being deemed a design specification. *PCL Constr. Services, Inc. v. United States,* 47 Fed. Cl. 745, 796 (2000).

In contrast, the *Spearin* doctrine does not apply to performance specifications; the contractor is free to employ its own means and methods to achieve an end product that is acceptable to the Government. *Daewoo Eng'g & Const. Co. v. United States*, 73 Fed. Cl. 547, 567 (2006), *aff'd*, 557 F.3d 1332 (Fed. Cir. 2009).

Accordingly, to identify whether a design or performance specification exists, we look to the amount of discretion provided in the contract to choose means and methods determines whether a specification is for design or performance. *Blake Constr.*, 987 F.2d at 746. Here, the contract stipulates that Talcott is responsible for the means, methods, and sequence of construction:

> The contract structural drawings and specification represent the finished structure. They do not indicate the method of construction. The contractor will provide all measures necessary to protect the structure during construction. Such measures shall include, but not be limited to, bracing, shoring for loads due to construction equipment . . . [N]or will the [Corps']

structural engineer be responsible for the contractor's means, methods, techniques, procedures, or sequences of construction.

DX 1118.

It is clear the contract includes performance requirements for the finished structure, not design specifications. Talcott was free to employ its own means and methods to complete an acceptable finished product. It is unreasonable for the court to consider that the Government would find the housing units in compliance with substantial mold growth in the crawl spaces, especially mold that covered floor joists, decking, walls, grade beams, and even appearing grass-like in the soil. DX 2317-23452.

Thus, we find that the Government did not breach the warranty of plans and specifications.

## II. Breach of Contract

Plaintiff asserts that the Government breached the contract because it had superior knowledge that mold growth would likely occur and intentionally or negligently failed to disclose that knowledge; and the design documents failed to mention the risk of mold growth.

### A. Superior Knowledge

A superior knowledge claim is valid unless the plaintiff knew or should have known that it would encounter that challenged condition. *Conner Brothers Const. Co., Inc. v. United States*, 65 Fed. Cl. 657, 688 (2005); *McCormick Constr. Co., Inc. v. United States*, 18 Cl. Ct. 259, 266 (1989) (citations omitted), aff'd, 907 F.2d 159 (Fed. Cir. 1990). Talcott certainly knew of the damp conditions on site.

The contract stipulates that "the site project superintendent will be held responsible for the quality of work on the job . . . [and] shall maintain a physical presence at the site at all times except as otherwise acceptance to the contracting officer and shall be responsible for all construction and construction-related activities at the site." JX001-320, Paragraph 3.1. Indeed, Jason Richerson, the superintendent for Talcott on the Phase 7E project, testified about managing manpower and subcontractors, coordinating deliveries, and facilitating quality control on a daily basis:

> Q: As a superintendent, you were required to know the conditions of the job site where JTC was working; is that right?
>
> A: That's correct.

Q: As superintendent, weren't you responsible for providing information about conditions at the site to JTC workers?

A: I am.

Q: How, if at all, would the first-floor assembly protect the crawl space from moisture?

A: You're not really getting a lot of moisture through from precipitation events . . . basically OSB is comprised of wood chips and glue. I mean, it's a pretty solid member. You don't really get a lot of moisture through it. And it's tied together with tongue-in-groove that's glued together . . . you're not really getting a lot of moisture from up above . . ."

Q: Well, if the moisture wasn't coming from above, do you know, was there moisture coming from below?

A: Yeah, so on Malmstrom, there's a lot of fatty clays that hold moisture. It's basically moist by nature.

Talcott was aware of mold growth while working as subcontractor in other phases of construction. Mr. Richerson's daily logs confirmed that workers encountered mold on the foundations of a phase of construction headed by Garco Construction:

Q: And there here is a section that reads: 'stoppages, delays, shortages, losses' is that right?

A: Yeah.

Q: I'm going to read it. It says, 'Garco crane broke down most of the morning. JTC foundation group redirected mold issues in 615 and 618.' Did I read that correctly?

A: Mm-hmm.

Q: So given that this report contains that statement, you were aware that there were mold issues in Building 615 and 618 at Phase 6; is that right?

A: Yeah, we . . . we run into . . . every now and then we had to get into the crawl spaces. And we were directed by Garco that when we run into that, just let them know. They'll take care of it and let us back in.

Q: Had mold been found in other crawl spaces in Phase 6?

A: I'm not sure I'd quantify.

Q: So you're saying you don't know how many crawl spaces?

A: Yeah, I'm sure – I'm sure we ran across it here and there.

Thus, we find that Talcott knew, or should have known, that damp site conditions would inevitably lead to mold growth in the crawl spaces.

### B. Geotechnical Report

In addition to their notice of conditions on site, the Government presented Talcott with information regarding the soil composition in a geotechnical report. Talcott received and reviewed a copy of the geotechnical report during the bidding process. A section entitled "Groundwater" notes the following:

> Our experience with groundwater conditions at Malmstrom AFB is that the groundwater can be encountered confined in sandy zones or thin sand seams within the relatively impervious clay soils. These groundwater occurrences tend to be sporadic and discontinuous both laterally and vertically.
>
> A second type of groundwater occurrence typically observed is when sand or sandier clay overlies the impervious fat clay and perched groundwater conditions can develop in the spring or following heavy precipitation events.

Even in the absence of this report, Talcott had an obligation under the contract to investigate the site thoroughly and to learn about the local conditions. FAR 52.236-3. Therefore, plaintiff cannot prove a claim of superior knowledge.

### III. Damages for Additional Directed Work

Talcott claims that the Government directed the performance additional work related to the mold cleanup. Defendant asserts that it simply notified Talcott that each option in CTA's mold abatement plan complied with the terms of the contract.

In this case, Talcott hired one industrial hygienist company and chose to proceed with their recommendation unilaterally. Indeed, the record contains no evidence of the Government selecting one method over another, nor expressing any preference. Plaintiff did not establish a basis for their claim that it performed work beyond that which they agreed upon within the contract.

We are unpersuaded that a "final inspection" to certify compliance with the expectations of the mold abatement clause is beyond the scope of the contract. It was reasonable for the Government to notify Talcott of this condition given the poor workmanship in almost every other aspect of the project. Indeed, witnesses testified about water prevalent on site that even when Talcott tried to dry the area by "put[ting] in place some of those temporary measures, like fans or dehumidifiers," it was "too little too late at that point." Tr. 1163:21-25 (Henson); Tr. 829:14-23 (Albrecht); Tr. 544:22-545:1 (Talcott, acknowledging that only "after we saw the mold, we started ventilating, started drying it out, started pumping water"); Tr. 550:2-4 (Talcott).

The Corps warned Talcott in a letter not to simply cover-up the mold, but to follow CTA's guidance to remove and remediate in accordance with the contraction prior to installation of the vapor barrier: "[Talcott] shall continue to implement the recommendations provided by CTA and have CTA perform final inspections prior to installed the vapor barrier to ensure that the mold problem has been sufficiently resolved." DX 20. It also encouraged Talcott to alter its construction sequencing and means and methods to avoid mold growth. direct result of installing the floor systems with wet soil conditions present in the crawl spaces and Talcott's failure to prevent the mold growth from occurring. We agree with the Government's claim that simple steps could have been taken to adequately dry out the crawl spaces by installing temporary ventilation and/or dehumidification, which would reduce the humidity level in the crawl spaces and prevent mold growth. JX21-4662

We find that Talcott's failure to perform in a skillful and workmanlike manner resulted in housing units that did not comply with the expectation that construction must remain free from any material defects. Here, pervasive mold in the crawl space is a material defect that Talcott was obligated to resolve at their expense. Therefore, the costs and delays associated with the mold remediation plan are squarely the responsibility of Talcott.

### IV. Other Damages

Talcott's complaint seeks additional damages, alleging that: (1) excessive inspections caused delays; (2) incomplete contracting materials caused grading and drainage problems; (3) scheduling delays increased costs; and (4) delays increased costs in the form of finding replacement subcontractors; and (5) liquidated damages.

#### A. Inspections

Talcott argues that the Government's inspections were excessive and resulted in numerous interruptions in. The Government reasonably conducted its quality assurance inspections in conformance with Talcott's expectations under the contract until August

2011. Plaintiff asserts that the Government changed its inspection procedures assigning a team of eight inspectors to the project that interfered with "Talcott's ability to complete its work in a timely and coordinated manner, stopped Talcott's performance of work, and caused extensive and unnecessary delays to completion of the work." Talcott also alleges that it hired quality control labor to compensate for the Government's interferences with their performance.

We find that any delay caused by the extra work is excusable and compensable under the contract. The contract stipulated that construction would always be subject to reasonable inspection to ensure the Government's satisfaction with the quality of construction. FAR 52.246-12 (Inspection of Construction). Plaintiff offered no evidence showing that the inspections to be unwarranted or overzealous. Talcott consistently demonstrated to the Government that it was in over its head and appeared willing to cut-corners. The Government acted within the confines of the contract terms to assure that it would receive the product as promised.

In sum, plaintiff's claim that inspections occurred outside the terms of the contract is without merit.

### B. Drainage and Grading

Talcott claims that deficient, incomplete, and uncoordinated plans increased the cost to complete the work because of drainage issues. Indeed, the original paperwork did not contain Amendment 6, which noted the foundation placement for each building. However, Talcott admitted that it knew of Amendment 6 prior to submitting their bid proposal. Tr. 528:17-19 (Talcott), and that Amendment 6 was included in the solicitation for bids that Talcott received prior to submitting a proposal for Phase 7E. DX2287, Nos. 43-44.

Talcott had a duty to check the contract materials, comparing drawings and verifying figures, before proceeding with construction. JX 1-186 (Special Clause 12). Their failure to meet this obligation led to foundation alignment issues: "Amendment 6 drawings had shirted the coordinates on the houses slightly" causing Talcott to "put in almost all the foundations" in the wrong places. JX 92-4863; JX 9-4648.

Notably, the Government accepted its share of responsibility for the mistake, despite contract clearly stating that liability rested with Talcott, and compensated Talcott for the costs and the time impact of Amendment 6. JX 213; JX 486. Talcott was awarded $30,939.83 for grading changes affected by the misplacement of the homes. Tr. 1128:11-13 (Henson); Tr. 596:1-4, 676:15-17.

Accordingly, Talcott's claim that it suffered damages and delays due to an incomplete contract is without merit.

### C. Scheduling

Talcott claims that it is entitled to damages because the Government caused delays to the project's critical path. We disagree.

Talcott struggled throughout the project, but most notably when pouring concrete and framing. This caused a significant delay to the critical path: "the project involved frozen concrete on the grade beam supporting building 624 . . . [it] took several months to resolve, drove building 624 onto the longest path, and led to a 145-day delay in completion of the project." Tr. 1747:8-22 (Boe).

Regardless, a contractor bears the burden of showing that project delays are attributable to the Government. In general, proving an allegation of government-caused delays without a means of showing the critical path is a steep prospect. *See, e.g., Wilner v. United States,* 26 Cl. Ct. 260, 274 (1992) ("Without a critical path analysis, the court [could] not exclude the possibility that the contractor caused concurrent delay on the project.") *rev. on other grounds, Wilner v. United States,* 24 F.3d 1397 (Fed. Cir. 1994). We observe that Talcott did not perform a critical path analysis and that the record does not support their allegation.

Consequently, Talcott is not entitled to damages for turning over the project after the deadline.

### D. Subcontractors

Talcott seeks recovery of labor costs incurred to hire a replacement subcontractor to finish the project. They claim that delays in scheduling, caused by the Government, drove a a subcontractor, Alpha Partners, to abandon the project.

Alpha Partners cited delays in project completion and scheduling difficulties in its termination letter to Talcott. However, as we determined above, the Talcott is responsible for the consequences of the delays in completion, including finding a replacement subcontractor. As such, Talcott is not entitled to recover labor costs for the replacement finishing subcontractor.

### E. Liquidated Damages

Talcott claims that it is entitled to liquidated damages in the amount of $175,455. However, because the project was completed 145 days late because of Talcott's own errors, this claim is without merit.

-13-

## CONCLUSION

For the reasons explained above, plaintiff failed to prove its claims at trial and is not entitled to damages. Therefore, the Clerk of Court will enter judgment in favor of defendant and **DISMISS** plaintiff's complaint. No costs.

**IT IS SO ORDERED.**

*s/Robert H. Hodges, Jr.*
Robert H. Hodges, Jr.
Judge